[L. A. No. 22026. In Bank. Jan. 16, 1952.]

HARRY ALKOW, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Harry Alkow, in pro. per., for Petitioner.

A. Ronald Button and Jerold E. Weil for Respondent.

THE COURT.—Petitioner was charged in twelve counts with the violation of his oath and duties as an attorney at law (Bus. & Prof. Code, ch. 4, art. 6, § 6103; art. 4, §§ 6067, 6068), the violation of rules 2 and 9 of the Rules of Professional Conduct of The State Bar of California (soliciting employment by advertisement; commingling of funds, 33 Cal.2d 27, 30), and the commission of acts involving moral turpitude and dishonesty (Bus. & Prof. Code, ch. 4, art. 6, § 6106). After four hearings, the local administrative committee found petitioner guilty as charged and recommended to the Board of Governors that he be suspended from the practice of law for a period of three years. The board, upon further hearing and review, dismissed three and sustained nine of the counts, made its own findings, and recommended three years' suspension.

Petitioner, who is 46 years of age, was admitted to practice in 1927. He contends in this proceeding (1) that the evidence is insufficient to sustain the board's findings and (2) that in any event, the discipline imposed is unduly severe. He cites the general rule that findings of fact made by a local administrative committee or the Board of Governors are not binding on this court, which will itself pass upon the sufficiency and weight of the evidence. (*Fall* v. *State Bar*, 25 Cal.2d 149, 159 [153 P.2d 1].) However, the burden is on petitioner to show wherein the decision of the board is erroneous or unlawful. (*Aydelotte* v. *State Bar*, 209 Cal. 737, 740 [290 P. 41]; *Ring* v. *State Bar*, 218 Cal. 747, 751 [24 P.2d 821]; *Light* v. *State Bar*, 14 Cal.2d 328, 336 [94 P.2d 35]; *Propp* v. *State Bar*, 20 Cal.2d 387, 390 [125 P.2d 825]; *Gaffney* v. *State Bar*, 20 Cal.2d 735, 740 [128 P.2d 516].) Petitioner has not met that burden.

Four of the nine counts involve petitioner's acts in connection with the Nick Harris Finance Exchange, a California corporation doing business as a collection agency. The board found that at all times here pertinent petitioner "alone controlled and directed [its] business and affairs." The board made further findings with regard to these four counts, as follows:

*Count two:* In November, 1946, one Rothert employed the exchange to collect a claim and paid $10 advance on court costs. Petitioner filed an action on the claim in April, 1947, but allowed a year to elapse before setting it for trial. In the following six months he had the action postponed several times until it finally went off calendar in August, 1948.

Some two months later petitioner told Rothert, in response to his inquiry as to when the case would be tried, that it would be settled in about 10 days. At the expiration of that time, Rothert was unable to contact petitioner and never has been able to do so either by letter or telephone; and petitioner made no effort to communicate with him.

*Count three:* In November, 1947, one Wynne consulted petitioner with the purpose of placing in the hands of the exchange a $900 claim for collection. He asked petitioner to bring an action thereon and gave petitioner $30 on account of court costs. Petitioner agreed to bring the action but said that the trial would not take place for about a year. In the following months petitioner told Wynne on several occasions that an action had been filed, and that it would come up for trial in November, 1948. However, no action had been filed nor did petitioner use for court costs the $30 previously given to him for that purpose.

*Count seven:* Petitioner maintained a bank account designated "Harry Alkow, Trustee," wherein he kept his own funds and those of clients. In May, 1948, one Watry assigned and delivered to the exchange for collection a promissory note for $2,026.22, at a fee of one third of the recovery. In June, 1948, petitioner was paid $1,675 in full settlement of the note, but he did not report it to Watry until five months later. He then gave Watry as part payment a check for $400, which was returned to Watry marked "insufficient funds." A month later petitioner gave Watry in part payment a cashier's check for $350 and his own check for $116.66, which was postdated and drawn on the "Harry Alkow, Trustee" account. The latter check was also returned to Watry marked "not sufficient funds." It was found that petitioner from June, 1948, had commingled Watry's pro rata of the recovery, $1,116.66, with funds belonging to the exchange, and that petitioner knew when he issued the checks for $400 and $116.66, that there were not sufficient funds in the banks accounts to cover them.

*Count ten:* On several occasions in July, 1948, an advertisement was carried in the Los Angeles Times reading:

> "ANYONE owe you money? See
> Nick Harris Collect. 650
> S. Grand. TR-3733."

At said times petitioner maintained his office at 650 S. Grand Avenue, and his telephone number was the same as that ap-

pearing in the advertisement; he had no other office or telephone.

The remaining five counts concern petitioner's acts as a practicing attorney in an individual capacity dealing with his clients' affairs. The board made findings with regard to these five counts as follows:

*Count four:* In September, 1948, petitioner issued his personal check in the sum of $31.75 to the order of the sheriff of Los Angeles County. At the time petitioner knew that he did not have sufficient funds in the bank for payment of the check. It has never been paid and petitioner is still obligated thereon.

*Count five:* In June, 1947, a Mrs. Welch employed petitioner to bring a divorce action against her husband. She paid him $115 as attorney fees and court costs. The action was tried in May, 1948, as a default case and Mrs. Welch was granted an interlocutory decree of divorce. However, petitioner failed to prepare such decree for the judge's signature, and none was ever entered. At the end of a year Mrs. Welch requested petitioner on several occasions to have the final decree entered; and on at least one occasion he told her that it had been entered, and that a copy was in the mail addressed to her. As above indicated, no interlocutory decree was ever entered and, of course, no final decree could have been entered.

*Count six:* In June, 1948, one Gleed employed petitioner to file a creditor's claim for $900 against a certain estate. Petitioner prepared the claim and Gleed verified it. At the same time Gleed paid petitioner $75 for court costs and attorney fees in the event an action should be brought on the claim. Thereafter on several occasions petitioner told Gleed that the claim had been filed, and that he had talked to the executor concerning a settlement of the matter. However, no claim was ever filed and the six-month period within which it could have been filed was allowed to expire. The board found that petitioner commingled the $75 with his own money and used it for his own purposes.

*Count eight:* In October, 1947, petitioner was retained by one Symansky to collect a $500 debt. Petitioner was paid $50 for court costs and was to receive 40 per cent of the recovery as his fee. He filed an action and thereafter in September, 1948, he settled the case for $250, but he did not inform his client of that fact until four months later. Petitioner then paid Symansky $100, although the latter was

entitled to receive $150. The board found that petitioner converted the remainder of his client's pro rata, $50, to his own use.

*Count nine:* In August, 1948, certain clients of petitioner gave him a check for $747 to be paid to one Falk in adjustment of an alleged overcharge of rentals. A month later petitioner gave Falk his personal check in that amount, but it was dishonored for lack of funds in petitioner's bank account. Three months later petitioner gave Falk $572 in cash and a check for $175, which was drawn on an account that had been closed. The board found that upon receipt of the $747, petitioner commingled it with his own funds and converted the whole thereof to his own use; and that $175 of the amount is still retained by him.

Upon these findings covering petitioner's several acts of wrongdoing, the board made its recommendation of three years' suspension. Petitioner claims that the charges were not established by ''convincing proof and to a reasonable certainty.'' (*Hildebrand* v. *State Bar*, 18 Cal.2d 816, 834 [117 P.2d 860].) But the record contains abundant credible evidence to sustain the findings on all charges, and it appears that petitioner's suspension for a period of three years is appropriate in view of the gravity of his continued misconduct over an extended time.

Petitioner maintains that the alleged acts of misconduct in his connection with the Nick Harris Finance Exchange are not matters chargeable to him but relate to dealings of the collection agency as a licensed corporate entity. (Counts 2, 3, 7, and 10.) In this connection, he calls attention to testimony to the effect that he went to work for the exchange as an attorney in 1933, at which time and until death in 1943, Nick Harris was the sole owner of the business; that it then passed to the latter's wife, Mary Harris, who incorporated the business and continued with it until her death in 1948; that upon such incorporation in 1943, petitioner neither then nor at any other time held shares of stock in the business nor was he a director thereof, but he simply continued his employment on a salary basis; that from 1944 until liquidation of the business in 1948 following attachment proceedings, Mrs. Harris and another person each owned approximately 50 per cent of the stock and actively supervised the business. During his connection with the work of the exchange, petitioner also conducted his own private

law practice on the premises, and after the liquidation of the collection agency, he ceased for some time to have any office.

Petitioner argues that there is no evidence which would show "such a unity of interest and ownership" as would justify disregard of the separate corporate entity of the exchange and render him legally accountable for its acts as his *alter ego.* (*Minifie* v. *Rowley,* 187 Cal. 481, 487 [202 P. 673]; *Hollywood Cleaning & Pressing Co.* v. *Hollywood Laundry Service, Inc.,* 217 Cal. 124, 130 [17 P.2d 709].) But whether or not the requirements of the *alter ego* doctrine are met has no significance here. Rather the instant proceeding presents the question of whether petitioner's conduct in connection with the collection agency complied with the prescribed standards of conduct for members of the legal profession.

■ The board found that the exchange was a corporation whose business and affairs petitioner "alone controlled and directed." There is ample evidence in the record to sustain this finding. The Chief of the Collection Agency License Division for the State of California testified that the license for the Nick Harris Finance Exchange had been issued annually for the years 1944-1948 in the name of Tom Morgan as managing director. The records of his department showed various complaints to have been filed against the exchange, and he testified that he had always discussed these matters with petitioner because he could never locate Mr. Morgan. He further added that in the course of one investigation of the affairs of the exchange in the district attorney's office, the persons listed on the records as officers and stockholders of the corporation stated in petitioner's presence that they were acting as "dummies for [his] benefit" and petitioner acknowledged that any claim with respect to the alleged misappropriation of moneys or conduct of the business was his "entire responsibility." Various investigators of the district attorney's office testified to the effect that petitioner, when questioned as to the management of the exchange's business, admitted that its alleged officers were not active in its affairs, that he was the "prime party" behind the corporation, the "controlling interest," and responsible for any claimed defalcations and thefts. A prospective purchaser of the exchange at the time when it was in the process of liquidation testified that in discussing the business with petitioner, the latter said that he was the "sole owner" of the stock; that he carried the corporation's

license in the name of Mr. Morgan because petitioner was an attorney and could not carry it in his own name; that Mr. Morgan was only a former employee and had no interest in the business; and that petitioner fixed the purchase price. Mr. Morgan testified that petitioner was in charge of the exchange and had employed him; that at petitioner's request, he took out the license for the corporation in 1944 in his name as managing director; that soon thereafter he found other employment and no longer was concerned with the business of the exchange except that petitioner paid him between $25 and $35 per month to continue to carry the corporation's license in his name, and he continued to sign jointly with petitioner the exchange's checks.

However, in the determination of this disciplinary proceeding, it does not matter whether petitioner actually owned or controlled the exchange. Petitioner does not challenge the sufficiency of the evidence to sustain the findings relating to his acts of wrongdoing in dealing with the clients of the exchange. (Counts 2, 3, and 7.) These findings unquestionably show conduct involving moral turpitude including repeated misrepresentations to those clients (*Stephens v. State Bar*, 19 Cal.2d 580, 583 [122 P.2d 549]) as well as the misappropriation of their funds. (*Gaffney v. State Bar, supra*, 20 Cal.2d 735, 739.) Petitioner attempts to evade responsibility for his wrongful conduct by hiding behind the corporate existence of the exchange and arguing that no relationship of attorney and client existed between him and its clients. But admittedly he was in the employ of the exchange as an attorney and was undertaking to litigate claims for its clients, who consulted with him in regard to such legal services and relied on his judgment in safeguarding their interests. Assuming that petitioner was acting only as representative or agent of the exchange in such matters, he nevertheless was obliged to comply with the required standards of honesty and good morals. (*Jacobs v. State Bar*, 219 Cal. 59, 64 [25 P.2d 401]; *Peterson v. State Bar*, 21 Cal.2d 866, 870 [136 P.2d 561].) "One who is licensed to practice as an attorney in this state must conform to the professional standards in whatever capacity he may be acting in a particular matter." (*Libarian v. State Bar*, 21 Cal.2d 862, 865 [136 P.2d 321].)

Likewise there is abundant credible evidence supporting the findings on the counts concerning petitioner's acts as a practicing attorney in an individual capacity dealing with

his clients' affairs. (Counts 4, 5, 6, 8, and 9.) This evidence shows numerous acts of misconduct, involving deliberate misrepresentations as well as misappropriation and commingling of clients' funds with his own. With respect to each of these counts, petitioner offers various excuses, presenting at best claims of alleged oversight and temporary financial distress. It would serve no useful purpose to detail these several explanations or his belated offers now to make amends through payment of the long overdue accounts with his clients. In any event, petitioner's continued course of conduct shows an habitual failure to give proper attention to his clients' affairs (*Waterman* v. *State Bar*, 8 Cal.2d 17, 20-21 [63 P.2d 1133]) as well as a total lack of appreciation of his fiduciary duties in his financial accountings, which derelictions cannot be condoned. (*Marsh* v. *State Bar*, 210 Cal. 303, 306 [291 P. 583]; *Ring* v. *State Bar, supra,* 218 Cal. 747, 752; *Glenn* v. *State Bar*, 14 Cal.2d 318, 328 [94 P.2d 43].) His continued practice of issuing checks which he knew would not be honored violates "the fundamental rule of ethics—that of common honesty—without which the profession is worse than valueless in the place it holds in the administration of justice." (*Tatlow* v. *State Bar*, 5 Cal.2d 520, 524 [55 P.2d 214].)

As substantial evidence supports the findings of the board covering petitioner's repeated instances of misconduct, as charged in counts 2, 3, 4, 5, 6, 7, 8, and 9, and such evidence is sufficient to sustain the recommendation of three years' suspension, it becomes unnecessary to consider whether the facts found under count 10 (newspaper advertising under the name of Nick Harris Finance Exchange) constitute a violation of the rule against the solicitation of professional employment. (Rule 2 of the Rules of Professional Conduct of The State Bar, *supra*, 33 Cal.2d 27; *cf. Light* v. *State Bar, supra,* 14 Cal.2d 328, 337-338.)

It is ordered that petitioner be suspended from the practice of law for a period of three years, commencing 30 days after the filing of this order.